**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BERNARD BLACK, as Trustee of the Joanne Black 2013 Trust Agreement, dated March 22, 2013, the Supplemental Needs Trust for the Benefit of Joanne Black, dated December 19, 1997 and Trustee of the Trust for the Benefit of the Issue of Renata Black, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) | Case No._____ |
| v. | ) ) | JURY DEMANDED |
| JEANETTE GOODWIN, individually and as Conservator for Joanne Black, | ) ) ) | |
| Defendant. | ) ) | |

**<u>COMPLAINT</u>**

Bernard Black ("Bernard"), as a Trustee of the Joanne Black 2013 Trust Agreement, dated March 22, 2013, as a Trustee of the Supplemental Needs Trust for the Benefit of Joanne Black, dated December 19, 1997, and as a Trustee of the Trust for the Benefit of the Issue of Renata Black (in these capacities, "BBlack Trustee"), by his undersigned attorneys, for his Complaint against Jeanette Goodwin ("Goodwin"), individually and as Conservator for Joanne Black ("Joanne"), alleges:

**Parties**

1.      Bernard is an individual who resides in Illinois.  He brings this action in his capacity as BBlack Trustee, and not in his personal capacity.

2.      Goodwin is an individual who resides in Colorado.

**Jurisdiction and Venue**

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

4.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the assets of the trusts at issue in this case are located in this District and because some of defendant Goodwin's acts that are the subject of this case, including her filing and prosecution of litigation in the Circuit Court of Cook County, Illinois, occurred in this District.

5.     Goodwin is subject to the personal jurisdiction of this Court because she took actions in this District, including filing a lawsuit in the Circuit Court of Cook County, Illinois against Bernard Black personally and against BBlack Trustee, having filed other claims and pleadings against Bernard Black personally and against BBlack Trustee, in cases currently pending in the Circuit Court of Cook County, Illinois, that are related to the subject of this case.

6.     Goodwin is further subject to the personal jurisdiction because she answered a complaint in federal court in Illinois, also related to the subject of this case, without objecting to lack of personal jurisdiction, and thus waived any objection to personal jurisdiction that she might otherwise have.

**Background Facts**

7.     Joanne is an individual who resides in New York.

8.     Bernard and Joanne are siblings.  They are the only children of Renata Black ("Renata").  Renata passed away in 2012.

9.     Throughout her life, Joanne has suffered from severe mental illness, sometimes involving periods of profound delusion and paranoia.  She has on occasion been deemed dangerous to herself and/or others and incapable of caring for herself.

10.    In 1997, Renata established an estate plan that included a simple, three-page will providing for her estate to be divided between two trusts, with two-thirds of her estate going to a Supplemental Needs Trust for the Benefit of Joanne Black (the "SNT") and the remaining one-third going to an Irrevocable Trust for the Benefit of the Issue of Renata Black, for the benefit of Bernard and his children (the "Issue Trust").

11.    Joanne is the primary beneficiary of the SNT, and the Issue Trust is the remainder beneficiary of the SNT.

12.    Joanne is not and has never been a beneficiary of the Issue Trust.

13.    Bernard is the executor of Renata's estate (in this capacity, the "Executor").

14.    Anthony Dain ("Dain") is an individual who resides in California. Dain is a licensed, practicing attorney in California. Dain was Renata's nephew and is a first cousin of Bernard and Joanne.

15.    At all relevant times, Dain has been a co-trustee of the SNT. At some relevant times, Dain also was a co-trustee of the Issue Trust. Dain, however, resigned as a co-trustee of the Issue Trust in December 2015.

16.    At the time of Renata's death in 2012, the bulk of her assets were several investment accounts with Vanguard with a value at the time of approximately $3 million.

17.    Shortly after Renata's death, it was discovered that shortly before she died, the "payable on death" ("POD") beneficiary designation on her principal Vanguard accounts was changed to make Joanne the beneficiary of 95% of these accounts, with the remaining 5% going to Bernard's five older children, who are Renata's grandchildren (the "POD Designations").

18.    If effective, the revised POD Designations would prevent funds in those accounts from being included in Renata's estate and passing under her will into the SNT and Issue Trust, and

would have instead conveyed 95% of the funds directly to Joanne, who, at the time, was not taking medication, was highly delusional, had run away from her home in New York, and was living essentially homeless on the streets of Denver, Colorado. At the time, Joanne was making graphic death threats against numerous members of her family, including small children, was attempting to contact the mafia to pay ransom for an imaginary billionaire husband, and had been arrested for breaking into a hotel.

19. Following Renata's death, there was a consensus among family members, including Bernard, Dain and Dain's sister, Cherie Wrigley ("Wrigley"), that, if given effect, the POD Designations would lead to disastrous financial and personal consequences for Joanne, would endanger the lives and safety of numerous people, and would undermine Renata's prior, careful provision of assets for Joanne in trust upon Renata's death. At that time, Bernard, Dain, Wrigley and other family members agreed that the POD Designations had to have been the result of mistake or fraud in the weeks before Renata, then an elderly woman, died.

20. A consensus was reached among the members of Renata's extended family that the most effective way to protect Joanne against Joanne's own incapacity and mental issues, to ensure Joanne's financial security and personal safety, and to implement Renata's long-standing estate plan for the entire family, was for all beneficiaries of the POD Designations to disclaim their entitlement to receive the Vanguard account proceeds so that the assets of those accounts could pass through Renata's estate according to Renata's estate plan.

21. In 2012 and 2013, Dain and Wrigley supported, and Wrigley actively assisted, Bernard in becoming a conservator for Joanne and seeking court authority to disclaim Joanne's POD benefits in Renata's accounts at Vanguard.

22.     In 2012, Bernard discussed this plan with Dain and asked Dain to become conservator and carry out the plan.  Dain approved the plan but declined to be conservator because he was uninterested in spending time on this endeavor.

23.     In 2012, as part of the plan to disclaim Joanne's and all other designated beneficiaries' POD benefits in Renata's Vanguard accounts, after Dain declined to become Joanne's conservator, Bernard initiated a proceeding in the Denver Probate Court in Colorado, where Joanne was living at the time, to be appointed conservator for Joanne.

24.     Bernard was appointed by the Denver Probate Court as Joanne's conservator in December 2012, and he remained in that position until 2015.

25.     As conservator for Joanne, Bernard obtained specific authorization from the Denver Probate Court to disclaim, on Joanne's behalf, Joanne's interest in Renata's accounts at Vanguard that resulted from the POD Designations.  The Denver Probate Court authorized the requested disclaimer.  As a result of that disclaimer, the assets in Renata's accounts at Vanguard flowed into Renata's estate, and were then distributed in accordance with her will, which reflected her longtime estate plan.

26.     As Dain and Wrigley understood, a purpose for the conservatorship petition was to allow Bernard to obtain workers compensation benefits for Joanne, based on her father's death at work, which Joanne was refusing to claim and was preventing Bernard from obtaining on her behalf.

27.     As Dain and Wrigley understood, a purpose for the conservatorship and the disclaimer was to prevent litigation over the validity of the POD Designations, which Joanne was in no position to defend.

28.     Wrigley assisted Bernard in obtaining disclaimers from Sarah Black and Rebekah Black.  Bernard explained the purpose and effect of the disclaimers to Wrigley.  Wrigley then explained the purpose and effect of the disclaimers to Rebekah, and also communicated with Sarah about the disclaimers.

29.     Dain and Wrigley both knew that, if the disclaimer was carried out, the disclaimed assets would flow into Renata's estate and be distributed according to her will, which provided that two-thirds of all residual assets (which would include the disclaimed funds) would go to the SNT and one-third would go to the Issue Trust.

30.     As Dain and Wrigley understood, once the disclaimer was carried out, and Bernard obtained workers compensation benefits for Joanne, Joanne's effective net worth, including the assets in the SNT and the 2013 Trust, exceeded $5 million, and was ample to support Joanne for the rest of her life.  As Wrigley wrote in a 2016 email, "Joanne doesn't need any money."

31.     In 2013, as conservator for Joanne, Bernard created an additional trust to hold workers compensation payments, other income, and assets for Joanne's benefit (the "2013 Trust").  Joanne is the primary beneficiary of the 2013 Trust, and Bernard's children (Renata's grandchildren) are the remainder beneficiaries of the 2013 Trust.  (Together with the SNT and Issue Trust, the three trusts are referred to herein as the "Black Family Trusts.")

32.     Dain was a co-trustee of the 2013 Trust at its inception in 2013.  Dain remained a co-trustee of the 2013 Trust until he resigned from that position in December 2015.

33.     In or about April 2013, Joanne moved from Colorado to New Jersey.  By the end of 2013, Joanne was residing in New York, and has resided in New York since then.  Joanne has

not lived in Colorado, since 2013. Joanne has never held any assets in Colorado. Joanne has not had any significant connection to Colorado since 2013.

34.    In September 2014, Bernard petitioned the Denver Probate Court for full guardianship powers over Joanne to better protect Joanne and her assets. The Denver Probate Court denied Bernard's petition on October 27, 2014, finding that Colorado no longer had jurisdiction over Joanne because Joanne was not a resident of Colorado. (A copy of the Denver Probate Court's order is attached as Exhibit A.)

35.    Due to lack of continuing Colorado jurisdiction over Joanne, Bernard initiated proceedings in New York in 2014 to establish personal needs and property guardianship over Joanne.

36.    Beginning in 2014, Dain, along with Wrigley and others, started pursuing a scheme to divert and strip assets from the Black Family Trusts for purposes of gaining control over those assets and using them for their own personal benefit.

37.    Dain's ostensible cover for this scheme was to claim that he was seeking to benefit Joanne. However, he and Wrigley both understood that Joanne did not need additional funds, and that the true purpose of the scheme was to benefit Dain, Wrigley, and their associates, by allowing them to control and spend Joanne's funds for their personal benefit.

38.    This scheme involved two steps. First, Dain, using his position as a trustee of the Black Family Trusts, instigated litigation in New York and Colorado seeking to reverse the disclaimer, and thus remove assets from the SNT and the Issue Trust. If Dain was successful, those assets would flow directly to Joanne, who in the initial stages of the scheme was involuntarily confined in a psychiatric hospital and was incapable of understanding what was happening.

39.     To further their scheme, Dain and Wrigley testified falsely in a Colorado court proceeding, which Dain caused to be filed, that they did not understand the effects of the disclaimer.  They were not successful in reversing the disclaimer at that time, but did persuade the Denver Probate Court to find that Bernard had breached his fiduciary duty as conservator by not providing notice to interested persons of the effects of the disclaimer.  The Denver Probate Court, based upon Dain's and Wrigley's false testimony, then entered a judgment against Bernard.

40.     The judgment that the Denver Probate Court entered against Bernard is a potential asset of the conservatorship.  However, as Goodwin knows, it has little or no actual value, because Bernard has few, if any, collectible assets.

41.     Dain's actions, in seeking to reverse the disclaimer and thus defund trusts of which he is a trustee, have led to a suit by beneficiaries of the Issue Trust against Dain for breach of his fiduciary duties to the Black Family Trusts, and against Wrigley and others for aiding and abetting that breach of fiduciary duty, filed in the United States District Court for the Eastern District of New York.

42.     Wrigley is a defendant in a second suit in the United States District Court for the Eastern District of New York, brought by the majority trustees of the SNT, seeking return to the SNT of approximately $200,000, which was stolen and misappropriated from the SNT by Wrigley's associate, Esaun Pinto, with Wrigley's knowledge and assistance.

43.     The second step of Dain and Wrigley's scheme involved Wrigley's effort to be appointed guardian for Joanne in New York, where Joanne then was residing, so that Wrigley could control Joanne's assets.  After Bernard initiated guardianship proceedings in New York concerning Joanne, Wrigley cross-petitioned to become Joanne's guardian.

44. Following a two-day evidentiary hearing in March 2016, the New York court found that Wrigley was unfit to be Joanne's guardian, further found that Joanne did not need either a property guardian (the equivalent of a Colorado conservator) or a personal needs guardian, and declined to appoint a guardian for Joanne.

45. Dain and Wrigley are motivated both by desire to seize control of the assets in the Black Family Trusts for their own personal benefit and by personal animus toward Bernard and his family. In the New York guardianship matter, the court found that there was "an uncontroverted, long standing intrafamily animosity that exists among them."

46. In the guardianship proceeding, the New York court found that Wrigley was unfit to be Joanne's guardian, even though Joanne had consented to the guardianship. The court found that Wrigley's actions against Bernard and his wife, Katherine Litvak Black ("Katherine"), at their place of employment, Northwestern University, were "disturbing at best," and that "her judgment clouded by acrimony, Wrigley allowed her feud with Bernard Black to take precedence over the best interests of Joanne Black."

47. The actions by Wrigley and others, supported by Dain, in attacking Bernard and Katherine with respect to their positions of employment at Northwestern University led the New York court to issue a TRO against further harassment of Bernard, Katherine, and other members of the Black family.

48. At the time that the New York court ruled on Bernard's guardianship petition and Wrigley's cross-petition for guardianship in 2016, Joanne had been a New York resident for most of her adult life, including continually since late 2013, and no longer had any meaningful connection to the State of Colorado. Thereafter, on information and belief, Joanne has never returned to Colorado except on one occasion in 2017 to attend a settlement conference.

49.     Following the New York court's ruling, Dain and Wrigley had to find another way to obtain control over Joanne's assets. Dain decided to try to use the Denver Probate Court conservatorship, which never had been terminated despite Joanne having long ago left Colorado and having no assets in Colorado, to further his scheme. Dain, therefore, undertook efforts to maintain the Colorado conservatorship over Joanne despite Joanne having no connection to Colorado whatsoever after April 2013.

50.     Dain is only one of three trustees of the SNT and has no power to act unilaterally for the SNT. He nonetheless has repeatedly sought and obtained authorization from the Denver Probate Court to spend SNT assets to pay lawyers (and an accountant) to pursue litigation against Bernard and Bernard's family.

51.     On information and belief, during 2016 and 2017, the then Colorado-appointed conservator for Joanne, Melissa Schwartz, Esq., concluded that the only rational course was to seek to settle the multistate litigation war that Dain and Wrigley had launched against Bernard and Bernard's family.

52.     The only realistic source of significant funds for any settlement would be a transfer from the Issue Trust to the SNT. In 2015, the Issue Trust trustees, including BBlack Trustee, had proposed a settlement involving transfer of all of the funds in the principal Issue Trust accounts to the SNT and appointment of an independent trustee for the SNT.

53.     Dain rejected this offer because it would leave an independent trustee, rather than Dain, in control of the SNT.

54.     Dain knows that such a settlement, while financially attractive to Joanne, would end any hope he has of controlling the Black Family Trust assets. Dain, therefore, has opposed

all efforts to settle matters involving the Black Family Trusts that do not allow him to control the assets in those trusts.

### Role of New Conservator, Jeanette Goodwin

55.     To ensure that any settlement that he did not approve concerning the Black Family Trusts would not be reached and implemented, Dain and his associates petitioned the Denver Probate Court in 2017 to replace Ms. Schwartz with a new conservator who would be more compliant with Dain's scheme.  Dain's plan was to use that new conservator to support his efforts to defund the Black Family Trusts and to obtain effective control over Joanne's assets for him and Wrigley to exploit.

56.     Goodwin was the new conservator that Dain and his associates selected to assist in his scheme.  Goodwin knows that, unless she supports Dain's efforts to seize control of and spend the assets in the Issue Trust and the SNT, she too can be replaced.

57.     On or about July 17, 2017, the Denver Probate Court granted a motion to remove Ms. Schwartz as Joanne's conservator and appoint Goodwin as successor conservator for Joanne.

58.     The Denver Probate Court appointed Goodwin as successor conservator for Joanne in July 2017 notwithstanding that a New York court, in 2016, sitting in the State where Joanne then resided, after holding an evidentiary hearing and considering evidence of Joanne's competence and need for a financial guardian, determined that Joanne did not need a financial guardian at that time.

59.     When it appointed Goodwin, the Denver Probate Court did not hold an evidentiary hearing before appointing Goodwin as successor conservator to determine Joanne's competence or capacity to make decisions concerning her money or assets or whether she needed a conservator to manage her assets.

60.     In fact, the Denver Probate Court has no jurisdiction to appoint a conservator for Joanne.  Indeed, in 2014, the Denver Probate Court concluded it no longer had jurisdiction over Joanne, due to Joanne's residence in New York.

61.     When Goodwin accepted her appointment, she knew that Joanne had not resided in Colorado since 2013, knew that Joanne had no assets in Colorado, knew or should have known that Joanne had been found competent in New York in 2016 to manage her own financial affairs, and knew or should have known that under these circumstances, her appointment as Joanne's conservator was improper and beyond the jurisdiction of the Denver Probate Court.

**Goodwin's Concealment of Legal Spending**

62.     Goodwin knows that unless she supports Dain's efforts to seize control of and spend the assets in the Issue Trust and the SNT, she will not only lose the additional conservator fees she will otherwise earn in this case, but will also lose the opportunity to be proposed as a guardian in other cases by Dain's associates, Lisa DiPonio and Gayle Young.

63.     Goodwin's responsibility, as conservator for Joanne in the Denver Probate Court, includes filing an annual accounting of her actions as conservator.  That accounting is due on April 11 of each year.  To date, Goodwin has filed an accounting for 2017, in April 2018; and an accounting for 2018, in April 2019.  In both filings, Goodwin has concealed the totality of her legal spending from the Denver Probate Court.

64.     Lisa DiPonio is Joanne's court-appointed counsel in the Denver Probate Court proceedings and is a close associate of Denver Probate Court Judge Elizabeth Leith, who frequently selects DiPonio as court-appointed counsel.

65.     As of September 2016, DiPonio had billed over $77,000 for acting as Joanne's court-appointed counsel.  DiPonio's bills since then are not known to Plaintiff, but are known or readily knowable to Goodwin.  DiPonio has been in the past, and expects to be in the future, paid

from SNT funds. Goodwin has concealed DiPonio's bills from the Denver Probate Court, in Goodwin's annual accountings, despite being obligated to report annually to the court on conservatorship income, expenses, and obligations.

66. Goodwin has knowingly concealed DiPonio's bills from the Denver Probate Court, and falsely reported the amount owed to DiPonio on her conservator report for 2018, filed in April 2019, as "unknown." Goodwin has concealed this information from the Denver Probate Court to maintain her position as conservator and curry favor with Dain, DiPonio, and Young.

67. Gayle Young is Joanne's court-appointed guardian-ad-litem in the Denver Probate Court proceedings. Young is a close associate of Denver Probate Court Judge Elizabeth Leith, who frequently appoints Young as guardian-ad-litem.

68. As of April 2017, Young had billed over $85,000 for acting as Joanne's guardian-ad-litem. Young's bills since then are not known to Plaintiff, but are known or readily knowable to Goodwin. Young has been in the past, and expects to be in the future, paid from SNT funds. Goodwin has concealed Young's bills from the Denver Probate Court, in Goodwin's annual accountings, despite being obligated to report annually to the court on conservatorship income, expenses, and obligations.

69. Goodwin has knowingly concealed Young's bills from the Denver Probate Court, and falsely reported the amount owed to Young on her conservator report for 2018, filed in April 2019, as "unknown," to maintain her position as conservator and curry favor with Dain and DiPonio.

70. Goodwin, DiPonio, and Young have also relied on an accountant, Pamela Kerr, in the Denver Probate Court proceedings and in other litigation in New York. As of July 2017, Kerr had billed over $113,000 for her services.

71.     Since then, Kerr has concealed her additional bills, for which she expects to be paid from conservatorship funds, and Goodwin has concealed these amounts from the Denver Probate Court, in Goodwin's annual accountings, despite being obligated to report annually to the court on conservatorship income, expenses, and obligations.

72.     Goodwin has knowingly concealed Kerr's bills from the Denver Probate Court, and falsely reported the amount owed to Kerr on her conservator report for 2018, filed in April 2019, as "unknown," to maintain her position as conservator and curry favor with Dain, DiPonio, and Young.

73.     Dain, Goodwin, DiPonio, Young, and Kerr all know that conservatorship over Joanne in Colorado case is a "money tree" for Goodwin, DiPonio, Young, and Kerr.  They all know that a settlement, such as those proposed by Bernard, would be beneficial to Joanne, but would bring to an end their ability to milk this money tree for ever larger amounts.  Dain knows that such a settlement, which would include appointment of an independent trustee for the SNT, will bring to an end his efforts to control the funds in the SNT and the Issue Trust.

74.     Goodwin knew, at the time of her appointment, of the circumstances that led to the petition to appoint Goodwin as Joanne's conservator, in place of Melissa Schwartz. Goodwin also knows that her continued employment depends on her pleasing and cooperating with Dain and his allies, including DiPonio and Young, regardless of whether her actions benefit Joanne or cause financial harm to Joanne.

75.     Goodwin knows of the 2016 New York decision finding that Joanne is competent to manage her own financial affairs.  Goodwin has, however, taken no steps to terminate the Colorado conservatorship.

76.     Goodwin knows that if she acts to terminate the Colorado conservatorship, the flow of money to Goodwin, DiPonio, Young, and Kerr will cease, and Dain will lose any hope of gaining control over the funds in the SNT and the Issue Trust.

77.     In addition to the concealed expenses for DiPonio, Young, and Kerr, Goodwin has incurred substantial expenses by hiring law firms in Colorado, Illinois, Oregon, and New York to pursue litigation against Bernard and members of his family, which she has concealed from the Denver Probate Court, either in full or in part.

78.     In Illinois, Goodwin incurred an unpaid obligation of around $511,000 to the law firm of Gould and Ratner. Gould and Ratner recently filed an attorney lien in Illinois on the amount that is owed to it, which will take priority over any recovery that Goodwin might hypothetically obtain from Bernard in Illinois. Goodwin has concealed this financial obligation to Gould and Ratner from the Denver Probate Court. Goodwin instead falsely reported an obligation for "Legal Fees for *all actions in Illinois*", as owed solely to Peter Stasiewicz, Esq. Mr. Stasiewicz replaced Gould and Ratner as counsel for Dain and Goodwin in Illinois after Gould and Ratner resigned due to nonpayment of bills. Goodwin has falsely reported the amount owed for "all actions in Illinois" as unknown, when she knows that the true amount owed to Gould and Ratner is at least $511,000.

79.     In Oregon, Goodwin has incurred an unpaid obligation of at least $86,000 to the law firm of Motschenbacher and Blattner. Goodwin has concealed this obligation from the Denver Probate Court, falsely failing to list any amount as owed to that firm on her conservator report for 2018, filed in April 2019. Instead, Goodwin reported paying $5,000 to Motschenbacher and Blattner in 2018 to "Manage all legal issues in Oregon."

80. In Colorado, Goodwin has incurred a large unpaid obligation to the law firm of Holland and Hart, which totaled over $449,000 as of June 2019. Goodwin has concealed the full amount owed to Holland and Hart, and instead falsely reported owing only $205,000 on her conservator report for 2018, filed in April 2019.

81. In New York, Joanne has incurred a large unpaid obligation to the law firm of Goldfarb, Abrandt, Salzman, and Kutzin.

82. Goodwin has recognized the responsibility of the conservatorship for Joanne's legal expenses in New York. In 2018, Goodwin sought and received authority from the Denver Probate Court to sell savings bonds held in the 2013 Trust so that "$27,000 will be paid to New York counsel for fees and costs which will most likely carry the Protected Person's representation thru the process of depositions." Goodwin also knows that the Goldfarb law firm has been in the past, and expects to be in the future, paid from SNT funds.

83. The unpaid bill for the Goldfarb firm is not known to Plaintiff. Goodwin has concealed this obligation from the Denver Probate Court, reporting nothing about it in her conservator report for 2018.

84. The Goldfarb firm billed and was paid for $150,000 from SNT funds for services through April 2016, and has done substantial work since then.

85. The unpaid amounts that Goodwin has listed in reports to the Denver Probate Court as unknown are either known to Goodwin or could be ascertained with reasonable effort.

86. In her prior annual conservator report for 2017, filed with the Denver Probate Court in April 2018, Goodwin provided no information about the amounts of outstanding legal bills that she had incurred on behalf of Joanne, the Conservatorship Estate of Joanne Black, or the SNT, in violation of her obligation as conservator to report fully on all of her activities.

Goodwin instead made the false claim that all amounts for all outstanding legal bills were "unknown."

87.     On information and belief, the total paid and unpaid bills which Dain and his associates, including Goodwin, have paid or seek to pay from the SNT, the 2013 Trust, and conservatorship funds equal or exceed $2 million, as of the date of this Complaint.  These amounts continue to increase.

88.     By concealing from the Denver Probate Court the amount of the legal bills that Goodwin, Dain and others acting in concert with them, including Wrigley, had incurred, Goodwin has provided substantial assistance to Dain in efforts to spend SNT assets for his personal benefit to the detriment of the SNT and its primary beneficiary, Joanne.

89.     In addition to these unpaid bills, Goodwin has also spent substantial amounts on legal expenses from conservatorship funds, including funds obtained by transferring savings bonds from the 2013 Trust to the conservatorship and then selling the savings bonds.  This spending totaled $55,000 in 2018.  Goodwin has never been a trustee of the 2013 Trust and had no proper authority to transfer assets of that trust to the conservatorship estate, or to use those funds to pay lawyers she hired.

90.     Goodwin has engaged in a pattern and practice of intentionally concealing from the Denver Probate Court the vast majority of the financial obligations she has incurred to attorneys and law firms, as well as others, as conservator.

91.     Goodwin has concealed and misreported amounts owed for legal expenses in order to retain her position as conservator, earn fees, and curry favor with Dain, DiPonio and Young.

92.    Goodwin's actions in concealing legal spending provide substantial assistance to Dain to support his campaign to defund the Black family trusts and seize control over their assets.

93.    Dain and Goodwin know that full and complete disclosure to the Denver Probate Court of the legal expenses that they have individually and jointly incurred might cause the Denver Probate Court to refuse to approve further expenditures from the SNT and the 2013 Trust to pay legal fees.

94.    Goodwin also knows that if the Denver Probate Court were informed about the true extent of the legal bills that Goodwin has incurred, it might take various actions, including replacing Goodwin or terminating the conservatorship, which would be adverse to Goodwin's personal interests as well as to Dain's campaign.  Dain and Goodwin, therefore, have agreed to conceal from the Denver Probate Court the amount of legal fees they have incurred and continue to incur.

### Goodwin Has Followed Dain's Instructions in Launching Litigation

95.    Since her appointment as Conservator for Joanne, Goodwin has followed Dain's directions and taken actions that knowingly provide substantial assistance to Dain's actions in breach of the fiduciary duties that Dain owed to the Black Family Trusts and to their beneficiaries, including Joanne.  Goodwin has also taken various actions that violate her own fiduciary duties to Joanne as Joanne's conservator.  In addition, Dain and Goodwin have conspired, for personal gain, to breach the fiduciary duties that they owe, respectively, to the Black Family Trusts and to Joanne.

96.    Dain and Goodwin have engaged in a pattern of conduct that has wasted trust assets set aside for Joanne's benefit, as well as conservatorship assets, in furtherance of Dain's scheme to enrich Dain and his sister, Wrigley, and in furtherance of Dain's and Wrigley's goal to

harm Bernard and his immediate family members, including Bernard's wife, Katherine, and Bernard's children.

97.    Goodwin, sometimes on her own, but other times in conjunction with Dain, has filed various claims, motions and petitions in court proceedings, including in the Denver Probate Court, in the Circuit Court of Cook County, Illinois, and in Oregon state court, to assist Dain in Dain's efforts to obtain access to, and control over, the assets held in the Black Family Trusts. Among other things, Goodwin has filed claims, motions and petitions in court proceedings, in Colorado, Illinois, and Oregon, and has supported actions in New York, which use or seek to use conservatorship assets and Black Family Trust assets to accomplish one or more of the following objectives:

    a.    Have the disclaimer that the Denver Probate Court previously approved declared invalid and to have the Order approving that disclaimer vacated;

    b.    Have what were the POD assets in Renata's accounts at Vanguard returned to Joanne's conservatorship estate in Colorado;

    c.    Have what were the POD benefits in Renata's accounts at Vanguard placed into the SNT with Dain as sole trustee of the SNT, or in another way placed under Dain's and Wrigley's control;

    d.    Have Bernard and his son, Samuel, who is a co-trustee of the Black Family Trusts, removed as trustees of the SNT and the 2013 Trust;

    e.    Have Bernard and his son, Samuel, barred from acting in their capacities as trustees of the Black Family Trusts with respect to the assets in the Black Family Trusts;

f.   Pursue damage claims and recoveries from Bernard, Kate, and Samuel to punish them out of malice and to deter Bernard and Samuel from pursuing actions that they believe are in Joanne's best interests, or actions that they believe are consistent with their fiduciary duties as trustees of the Black Family Trusts;

g.   Pursue frivolous claims in Oregon against Kate and Kate's cousin, Olga Dal, which serve no purpose other than to further escalate legal costs; and/or

h.   Allow Dain to use, and support Dain's use of, assets of the Black Family Trusts to fund litigation activities all over the country, including in Illinois, against Bernard, Kate, Samuel, and others to accomplish one or more of the foregoing objectives.

98.   Goodwin has used legal process to impose freezes on the assets of the Black Family Trusts and the Estate of Renata Black, preventing the trusts and the Estate from paying income and property taxes, and causing the trusts and the Estate to incur late fees and penalties and legal expense, which is contrary to Joanne's interests.

99.   Goodwin knows that she has no legal right to freeze assets belonging to the Estate of Renata Black, but has continued to do so.

100.   These freezes imposed by Goodwin have prevented the trusts from engaging accountants to prepare tax filings, exposing the trusts to further penalties for failing to make required annual federal and state income tax filings, which is contrary to Joanne's interests.

101.   During 2018, the trustees of the Issue Trust made a specific, written settlement proposal to Goodwin and, in the alternative, proposed mediation aimed toward settlement. Goodwin refused to respond to this proposal.

102.    As of December 31, 2018, unpaid property taxes on a house located at 26 McKeel Avenue, Tarrytown, New York (the "McKeel Avenue house"), which under the will of Renata Black is to be contributed to the SNT, amount to approximately $17,000, plus late fees and penalties.

103.    The foregoing amount of unpaid taxes amount does not include approximately $12,000 in property taxes on the McKeel Avenue house, which were paid by the Executor out of personal or borrowed funds, or were paid by New York counsel to Joanne Black, to avoid additional consequences from nonpayment of taxes, including an auction of the house that the Village of Tarrytown would have otherwise carried out to pay unpaid taxes. Rather than address that potential crisis, and harm to Joanne, Goodwin has taken actions to maintain her illegal freeze on the assets of the Estate of Renata Black.

104.    Income tax returns for the Black Family Trusts for 2017 are overdue, returns for 2018 will soon be due, and returns for both years cannot not be filed until the tax accountants are paid the approximately $6,000 they are owed for preparing prior returns, which cannot be paid due to the freezes on trust accounts that Goodwin has sought to impose and maintain, and due to her depleting entirely the assets of the 2013 Trust.

105.    Dain, with Goodwin's active participation of Goodwin as a plaintiff or intervenor, has sought to use litigation around the country to freeze money in the Black Family Trusts, and in particular, to keep Bernard and Samuel from having access to the assets of those trusts to hire attorneys to defend the trusts against Dain's efforts to remove assets from those trusts.

106.    Dain, with Goodwin's cooperation and assistance, has spent or caused to be spent over $500,000 in Black Family Trust assets to fund multiple cases and legal proceedings in at least four states against Bernard, Samuel and others, including Bernard's wife, Katherine Litvak,

to accomplish his objective of either obtaining sole control of the Black Family Trusts or removing money from these Black Family Trusts.

107.     Dain, with Goodwin's cooperation and assistance, has caused to be incurred, and is seeking to use funds from the Black Family Trusts to pay, additional legal fees that amount to at least an additional $1 million, in support of these efforts.

108.     Goodwin has actively supported Dain's efforts to obtain authorization from the Denver Probate Court to pay legal fees using SNT funds.

109.     Goodwin has further supported Dain's efforts by filing lawsuits in her capacity as conservator, and filing motions in existing lawsuits, in Illinois and Oregon, intervening in lawsuits brought in Illinois, and seeking authority from the Denver Probate Court to spend assets of the Black Family Trusts to pay for this litigation.

110.     Goodwin has done this while concealing from the Denver Probate Court the amount of litigation activity and spending that she has engaged in and supported, and the cost of that litigation to Joanne and to the Black Family Trusts, by failing to disclose this information in her annual conservator reports.  Goodwin also has concealed her legal spending by failing to comply with discovery requirements in Illinois litigation calling for production of all legal and accounting bills.

111.     Goodwin knows, or is reckless in not knowing, that unpaid legal bills, that Dain seeks to have paid from the SNT, substantially exceed $1 million and continue to rise rapidly, in addition to the approximately $750,000 in funds of the conservatorship, the SNT, or the 2013 Trust already spent on legal and professional fees.

112.     Goodwin knows, or has reason to know, that if these amounts are disclosed to the Denver Probate Court in her conservatorship annual reports, as they are required to be under

Colorado law, that the Denver Probate Court will be unwilling to support Dain's and Goodwin's continued spending of conservatorship and trust funds.

113.    In all of Dain's and Goodwin's litigation activities to date, they have not recovered any money for Joanne or for any of the Black Family Trusts.

114.    Dain and Goodwin have no reasonable prospect of ever recovering money from Bernard or any of the members of Bernard's family for Joanne or the Black Family Trusts through continued litigation.  Their actions only have served to cause the depletion of the assets of those trusts.

115.    Goodwin's litigation activities against Bernard and members of Bernard's family, often in concert with Dain, have involved the expenditure, or planned expenditure, of an estimated $2 million or more in assets of the conservatorship and the Black Family Trust, including unpaid amounts substantially exceeding $1 million, for which Goodwin and Dain are seeking payment from the SNT.  Goodwin's litigation actions have caused additional spending by the trustees of the Black Family Trusts, and have caused the trusts to incur well over $1 million in debt to lenders to the trusts, which the trusts are obligated to repay.  Such actions are wasteful and not in Joanne's best interests.

116.    Through the date of this Complaint, legal expenses incurred by Dain and Goodwin to challenge loans to the Black Family Trusts exceed $500,000.  In addition, legal expenses for counsel for the lenders to the trusts, which relate almost entirely to defending the litigation launched in Illinois by Goodwin and Dain, exceed $300,000, and the trustees' legal expenses, related to defending against the litigation Goodwin and Dain have pursued in Illinois, exceed $200,000.

117.   Thus, Goodwin's litigation concerning the trust loans alone has caused legal spending in excess of $1 million.   This compares to underlying loan amounts, at the time the challenge was launched, of around $700,000.   Yet Goodwin has failed and refused to consider settling her challenges to the trust loans.

118.   Goodwin's spending on legal actions is grossly disproportionate to the amounts at stake.   It constitutes a breach of her fiduciary duty to Joanne to conserve trust assets set aside for Joanne's benefit.   It is designed and intended to aid and abet Dain in his ongoing breaches of his fiduciary duties to the Black Family Trusts.

119.   On information and belief, Goodwin has never conducted any analysis of the cost to the conservatorship and the SNT of the litigation she has launched and supported, versus the reasonably expected benefit of this litigation.

120.   Goodwin's litigation activities against Bernard and members of Bernard's family have not resulted in the recovery of any money for Joanne or any trust of which Joanne is a beneficiary.

121.   The Conservatorship Estate of Joanne Black and the SNT are joint and several creditors of Bernard, for a Colorado judgment currently on appeal in Colorado.   However, Goodwin knows, or is negligent in not knowing, that there is no meaningful prospect of recovering from Bernard personally.

122.   Goodwin's and Dain's joint actions, by driving up legal costs for the Black Family Trusts have depleted and continue to deplete the Issue Trust, which is the only realistic potential source of recovery that the Conservatorship Estate can achieve.

123.    Goodwin's litigation activities have served to benefit only Dain in Dain's efforts to obtain access to Black Family Trust assets to fund Dain's litigation activities against Bernard and members of Bernard's family.

124.    Goodwin's actions, to the extent that they have caused or allowed funds to be expended from the SNT or the 2013 Trust have been wasteful in that they have not caused the recovery of, and do not have any reasonable prospect of causing the recovery of, funds that would be available for Joanne's benefit in an amount even remotely comparable to the amount expended on legal fees.  Goodwin's actions thus breach the fiduciary duties that Goodwin owes to Joanne.

125.    Goodwin knows, or reasonably should know, that Dain is acting, and has acted, in breach of the fiduciary duties that he owes, and/or previously owed, as a trustee of the Black Family Trusts, to the Black Family Trusts and to the beneficiaries of those trusts.

126.    Goodwin knows of Dain's ongoing breaches of fiduciary duty to the Black Family Trusts.

127.    Goodwin has acted to support and provide substantial assistance to Dain, knowing that Dain faces a conflict of interest between the actions that serve his personal interest and those of his sister Wrigley, and the actions that would be consistent with his fiduciary duty to the Black Family Trusts, and knowing that Dain has acted to favor his personal interests at the expense of the interests of the Black Family Trusts and their beneficiaries, including Joanne.

128.    Goodwin's litigation activities, both in cases which she brought as conservator, in which Dain is not a party, and cases in which she and Dain have participated jointly, have provided substantial, knowing assistance to Dain, which have enabled Dain's breaches of the fiduciary duties that Dain owes to the Black Family Trusts to continue.

129.     In taking actions that are in the best interests of Dain and Wrigley, but not in the best interests of Joanne, Goodwin has breached her fiduciary duties to Joanne.

130.     In taking actions that are in the best interests of Dain and Wrigley, but not in the best interests of the Black Family Trusts, Goodwin has aided and abetted Dain's breaches of fiduciary duty to those trusts and their beneficiaries, including Joanne.

131.     Among Goodwin's actions in breach of her fiduciary duties to Joanne, and in providing knowing and substantial assistance to Dain's actions in breach of his fiduciary duties to the Black Family Trusts, have been Goodwin's insistence that any settlement discussions with Bernard for litigation in which Goodwin is involved include terms and provisions that serve Dain's and Wrigley's personal interests, but which provide no benefit to (and indeed harm) Joanne and the other beneficiaries of the Black Family Trusts.  Goodwin has insisted that any settlement agreement release Dain and Wrigley from any and all liability and damages for harm caused to the Black Family Trusts even though such a release would not serve Joanne's interests or benefit Joanne in any way.

132.     Goodwin has refused to obtain counsel independent of Dain in any of the multistate litigation she has pursued, including in Illinois, notwithstanding that Joanne's interests and Dain's interests are in conflict.  Goodwin instead has followed Dain's lead in selecting counsel and pursuing actions that are not in the best interests of Joanne or any of the beneficiaries of the Black Family Trusts, including Joanne, but instead are in furtherance of Dain's malicious and wrongful intentions to harm Bernard and Bernard's family and to seize control of the assets in the Black Family Trusts for his own personal benefit and for the benefit of his sister, Wrigley.

133.    On information and belief, Goodwin is taking direction from Dain, and from attorneys hired by Dain who take instructions from Dain, in connection with the multistate litigation activities that she has pursued against Bernard and members of Bernard's family, without making any independent assessment of whether those litigation activities are in the best interests of Joanne or the beneficiaries of the Black Family Trusts, including Joanne.

134.    The litigation activities that Goodwin has pursued in this District in Illinois include filing an action in the Circuit Court of Cook County, Illinois to remove Bernard and Samuel as trustees of the SNT, to seek dissolution of the 2013 Trust and to seek other relief against Bernard, Samuel and other members of Bernard's family ("Trustee Removal and Trust Dissolution Case"). Filing that action was contrary to Joanne's interests, both individually and as a beneficiary of the SNT and 2013 Trust.

135.    A principal purpose of the 2013 Trust is to receive, hold, and distribute for Joanne's benefits workers compensation payments in an amount of over $1,000 weekly. Joanne previously sought to prevent Bernard from obtaining those benefits. On information and belief, Joanne previously attempted to cancel her Social Security Disability Insurance benefits. If the 2013 Trust were dissolved, there is a risk that Joanne may do so again and succeed. If this trust were dissolved, there is a further risk that Joanne may simply fail to cooperate with annual requests for information sent by the workers' compensation insurance company, which would result in the loss of benefits.

136.    On information and belief, Goodwin filed the Trustee Removal and Trust Dissolution Case at Dain's direction, despite the harm to Joanne that the dissolution of the 2013 Trust would cause. On information and belief, Goodwin filed that action to support Dain's effort

to become sole trustee of the SNT. Dain's objective then was to loot the SNT for the personal benefit of himself and his sister, Cherie Wrigley.

137.     On information and belief, Goodwin hired counsel to represent her in that case at Dain's direction. The law firm that Goodwin retained to represent her in that case also represented Dain in other matters. On information and belief, that law firm acted at Dain's direction in that case. The law firm rarely, if ever, consulted with Goodwin concerning the conduct of the case.

138.     In response to a motion to dismiss in the Trustee Removal and Trust Dissolution Case, Goodwin voluntarily dismissed her claims in that case. She did so in recognition that it was not brought with a sound basis in the first place.

139.     The end result of the filing and dismissal of the Trustee Removal and Trust Dissolution Case was to impose legal costs on the trustees of the Black Family Trusts. Those fees are reimbursable, in whole or in part, from trust assets. Thus, the filing of the case was contrary to Joanne's interests in that it served to reduce assets in the 2013 Trust and SNT available for her benefit.

140.     Goodwin, along with Dain, also sought to intervene in multiple cases filed in the Circuit Court of Cook County, Illinois by Bernard's wife, Katherine, and by Bernard's cousin, Olga Dal. Katherine and Olga Dal sought in those cases to recover money loaned money to the Black Family Trusts to allow the trustees of the trusts to have money available to defend the trusts against Dain's attacks. On information and belief, Goodwin's counsel in those cases was hired by Dain. On information and belief, Goodwin's counsel acts at Dain's direction in those cases. Goodwin's actions in those cases, including incurring more attorneys' fees for Joanne and/or the Black Family Trusts, are contrary to the best interests of Joanne and the beneficiaries

of the Black Family Trusts, including Joanne. Those actions have been directed by Dain to further Dain's own personal interests and agenda.

141.    Goodwin's actions in the Cook County, Illinois litigation as set forth above constitute a breach of the fiduciary duties that she owes to Joanne. Goodwin's acts are intended to assist Dain's breach of fiduciary duties as trustee of the SNT and have caused damages to Joanne and the Black Family Trusts. Such damages include the legal fees incurred in all of the litigation initiated and furthered by Dain and Goodwin.

142.    The law firm that filed the Trustee Removal and Trust Dissolution Case on Goodwin's behalf, which also represented Goodwin in other Illinois cases, has not been paid, has resigned, and has been replaced by new counsel. On information and belief, that new counsel was selected by Dain. On information and belief, new counsel has been taking instructions and directions from Dain. Goodwin has allowed Dain to direct counsel to act in the litigation as Dain sees fit.

143.    On information and belief, Goodwin has failed at any time to conduct any analysis of the costs and benefits to Joanne of bringing and intervening in the multiple Illinois cases. On information and belief, Goodwin has failed to conduct any such analysis for the other litigation she has brought or supported.

144.    In April 2018, Dain drafted, and caused Joanne's counsel Lisa DiPonio to submit, a brief in the Colorado conservatorship proceeding arguing that the Disclaimer should be declared invalid. The effect of undoing the Disclaimer would be to completely defund the SNT and the Issue Trust. The undoing of the Disclaimer is contrary to Joanne's interests in that it would allow Joanne to receive millions of dollars directly, not in trust, which she likely would

squander. Dain and Wrigley have sought to invalidate the Disclaimer so that they may use their influence over Joanne to gain unfettered control of Joanne's funds for their own personal benefit.

145. Goodwin failed to oppose Dain's renewed effort to invalidate the Disclaimer in the Denver Probate Court. In failing to act to preserve the SNT's assets for Joanne's benefit, Goodwin was acting contrary to Joanne's best interests, but acting to support Dain's and Wrigley's efforts to defund the SNT and Issue Trust and gain control over the assets in those trusts by unduly and improperly influencing Joanne to gain control over those assets under the guise of assisting her.

146. The Denver Probate Court granted Dain's renewed request to invalidate and undo the Disclaimer. The Denver Probate Court made that ruling in direct contrast to its prior decision in 2015 on that same issue.

147. Goodwin thereafter has opposed Bernard's efforts, as a trustee of the SNT, to stay this decision, pending appeal. In that pending appeal, Goodwin is supporting reversal of the Disclaimer, despite the harm this would cause to Joanne's interests.

148. In April 2017, Dain sought approval from the Denver Probate Court to pay an additional $250,000 in legal and accounting fees that he has incurred in litigation around the country from the SNT. This amount was in addition to the more than $500,000 in attorneys' fees Dain has incurred in such litigation that previously had been paid from the SNT and the Joanne 2013 Trust.

149. Goodwin knew that using the SNT to pay attorneys' fees would deplete the assets of the SNT. Goodwin nonetheless failed to oppose Dain's motion. On information and belief, Goodwin made no analysis of whether the attorneys' fees that Dain had incurred were in Joanne's best interests or in the best interests of the SNT.

150.    The Denver Probate Court granted Dain's motion to pay his attorneys' fees from the SNT.

151.    Goodwin opposed a motion from the majority SNT trustees to stay this order. Goodwin's actions in opposing a stay of the Denver Probate Court order authorizing spending of SNT funds and defending the appeal of this order have provided substantial assistance to Dain in Dain's effort to use SNT funds to finance his litigation against Bernard and Bernard's family, as well as Dain's efforts to obtain access to and control over the assets in the Black Family Trusts.

152.    Dain has sought, and continues to seek, sole control over the SNT even though he is only one of three trustees of the SNT.

153.    Goodwin has provided substantial assistance to Dain in his quest for sole control of the SNT, through her own litigation actions and inactions.

154.    In March 2018, an arbitration panel of the Financial Institutions Regulatory Authority (FINRA) issued an order preventing JPMorgan Securities from allowing the SNT or Issue Trust funds from being spent to support litigation, pending final resolution in the Colorado courts of whether Colorado has jurisdiction over the SNT, the Issue Trust, or both.

155.    Following this order, Goodwin understood that the SNT could no longer be used as a source of funds to support her joint litigation efforts with Dain until final resolution of disputes over jurisdiction were resolved in the Colorado courts.  Goodwin then caused Joanne's counsel, Lisa DiPonio, to file a motion in the Denver Probate Court seeking authority to sell certain savings bonds held in the Joanne 2013 Black Trust, which were the only remaining assets of that trust.  Goodwin sought to have those bonds sold to fund additional litigation against Bernard and his family.  That litigation is designed to assist Dain and Wrigley in their efforts to gain control over assets that Renata wanted held in trust for Joanne's benefit.  Goodwin caused

that motion to be filed and pursued notwithstanding the existence of a citation to discover assets in Illinois that prohibited Goodwin from disposing of assets of the 2013 Trust while the citation remained pending. Goodwin, through this motion, provided substantial assistance to Dain in his quest for a source of funds to finance his litigation actions against Bernard and Bernard's family, and in his quest to obtain sole control of the SNT so that he can exploit it for his own personal benefit and the benefit of his sister, Wrigley.

156.    Goodwin concealed from the Denver Probate Court the existence of the Illinois citation preventing her from disposing of assets of the 2013 Trust, and sold the savings bonds in the 2013 Trust and removed the proceeds from the 2013 Trust, notwithstanding the citation, to pay legal bills in support of Dain's efforts to control the assets in the Black Family Trusts.

157.    To obtain approval from the Denver Probate Court to allow Dain to spend the funds of the SNT and the 2013 Trust to finance his litigation activities, Dain has concealed from the Denver Probate Court the extremely large sums of money that he already has spent on such activities, and the additional legal bills that he has incurred that remain unpaid.

158.    As part of his effort to conceal his ongoing breaches of fiduciary duty, Dain has sought to conceal his correspondence with Goodwin and others, including Goodwin's and Joanne's attorneys, from the adverse parties in the litigation that Goodwin and Dain have brought.

**Wasteful Litigation in Oregon**

159.    Goodwin and her predecessor conservator have brought, and Goodwin has filed motions in, two lawsuits against Bernard in Oregon. One of those cases was voluntarily dismissed by Goodwin in response to a motion to dismiss, but only after legal expense had been incurred on both sides, and was only recently refiled. The second case has been pending for

more than a year, with minimal activity until recently. Moreover, the second case cannot produce a recovery unless Goodwin wins both cases.

160. This combined effort, if Goodwin were to pursue it, would involve spending substantial additional funds from the Black Family Trusts for an uncertain recovery. On information and belief, the maximum amount that could be recovered is less than the amount of legal fees that would be required to pursue these two cases.

161. On information and belief, Goodwin has failed at any time to conduct any analysis of the costs and benefits to Joanne or the Black Family Trusts of the Oregon litigation.

162. On information and belief, Goodwin has pursued litigation in Oregon, at the direction of Dain, to further harass Bernard and his family, with no realistic prospect of recovery that would warrant the expenditure of funds necessary to prevail.

163. On information and belief, Dain is communicating regularly with Oregon counsel for Goodwin, and is directing the course of the Oregon litigation. Goodwin has allowed Dain to control the Oregon litigation, much as she has allowed Dain to control Illinois litigation. Goodwin personally has had minimal contact with her Oregon counsel.

164. At Dain's instruction, Goodwin has entered, and caused counsel to enter on her behalf, a Common Interest and Joint Defense Agreement with Dain and others. Goodwin and Dain have then used this agreement to conceal their correspondence. However, Goodwin knows or should know that entering into this agreement is improper because of the conflict between Joanne's interest in recovery of funds for the SNT from Dain and Wrigley in the suits against them, and Dain's interest in blocking any such recovery.

**Goodwin's Violation of an Illinois Citation Concerning the 2013 Trust**

165.    The 2013 Trust held, until recently, savings bonds purchased by Renata Black worth over $90,000.  These assets were subject to a citation to discover assets in Illinois, served on Goodwin by Olga Dal, who obtained a judgment against the 2013 Trust.

166.    In 2018, Goodwin violated the injunctive prohibitions contained in the citation to discover assets served on her and transferred these bonds to the Colorado conservatorship estate for Joanne.  Goodwin then sold the bonds.  Goodwin then used the proceeds of the sale to pay lawyers to litigate on her behalf and Dain's behalf against Bernard and his family.

167.    Goodwin obtained permission for this transfer from the Denver Probate Court without informing the Denver court of the citation that has been served on her in Illinois and its restrictions on transfers of trust assets.

168.    Goodwin has ignored a demand from the lender that she return the proceeds from sale of the savings bonds to the 2013 Trust.

169.    Goodwin's violation of the injunctive prohibitions against transfer of trust assets in the Illinois citation to discover assets is an example of the extreme lengths to which Goodwin is willing to go to support Dain's litigation attacks on Bernard, his family and the Black Family Trusts.

**Goodwin's Further Bad Acts to Assist Dain**

170.    It is now almost seven years since Renata Black died, and Joanne has yet to receive any personal benefit from the litigation that Dain has fostered, and that Goodwin has supported and joined.

171.    Goodwin and her predecessor conservators have entirely depleted the assets of the 2013 Trust, once valued at around $300,000, to pay legal and accounting fees, to assist and support Dain's actions in breach of his fiduciary duties to the Black Family Trusts.

172.     Since Dain's litigation activities seeking control of the Black Family Trusts began, Joanne personally has not received any funds from the SNT or the 2013 Trust, other than small amounts transferred to her by Bernard as SNT trustee. These payments ended in April 2014, when Dain succeeded in blocking Bernard from making further payments to Joanne from the SNT.  Since then, only lawyers and accountants have been paid from the SNT.

173.     Goodwin has never sought, and continues not to seek, any payments from the SNT or the 2013 Trust to directly benefit Joanne.  Goodwin instead continues to pursue litigation in multiple states, and continues to seek payment of legal fees from the SNT and the 2013 Trust.

174.     Instead of seeking to provide support to Joanne from the SNT, Goodwin has spent for Joanne's benefit only a portion of the income Joanne receives from workers compensation payments.  The remainder of the workers compensation payments are used to pay legal fees and Goodwin's own fees.

175.     As of March 31, 2019, the Black Family Trusts are indebted to lenders to the trusts in the approximate amount of $1,700,000, which amount continues to increase due to the continuing course of conduct pursued by Dain, with Goodwin's active knowledge and assistance.

176.     As of March 31, 2019, the Estate of Renata Black is indebted to the Executor, who is entitled to recover these amounts from the SNT and the Issue Trust, in the approximate amount of $580,000.

177.     BBlack Trustee has incurred expense of over $400,000 to pay legal expenses of the trustees, incurred to defend the Black Family Trusts against the Dain-Goodwin litigation campaign, for which he is entitled to reimbursement from the SNT.

178.     When added to the amounts that Dain has spent or caused to be spent from the Black Family Trusts, and is seeking with Goodwin's knowledge and assistance to spend to pay

already incurred legal bills, the total harm to the Black Family Trusts from Dain's and Goodwin's conduct exceeds $4 million, and continues to increase.

179.    Goodwin knows, or is reckless in not knowing that there is no conceivable way that this level of legal spending can benefit Joanne or any trust of which Joanne is a beneficiary.

180.    Goodwin knows, or is reckless in not knowing, that if she does not cease supporting Dain's litigation war against the Black Family Trusts, the trusts will be depleted further, leaving little or nothing for Joanne and the other trust beneficiaries.

181.    Goodwin knows, or is reckless in not knowing, that the only sensible way out of the litigation morass, which she has provided knowing and substantial assistance to Dain in bringing about, is to seek to resolve that litigation through settlement.  Goodwin, however: (i) in a mediation in July 2017, held at the order of the Denver Probate Court over the objection of Dain and his supporters, supported Dain's insistence on a full release for himself and Wrigley as a condition to settlement; (ii) has refused to respond in any way to settlement offers she has received, and to proposals for mediation that she has received in the spring of 2018, and (iii) refused again to respond to settlement overtures in the fall of 2018.

182.    In an interpleader action brought by Chase Bank and JPMorgan Securities in the Northern District of Illinois ("Interpleader Action") to resolve competing claims to the SNT and Issue Trust assets, Goodwin has chosen to be represented jointly with Dain, by counsel chosen by Dain, and has allowed Dain to dictate litigation strategy, regardless of benefit or harm to Joanne.

183.    In May 2019, DiPonio, with Dain's and Goodwin's knowledge and support, filed an *ex parte* motion with the Denver Probate Court seeking a finding of civil contempt against

Bernard Black for failing to deposit assets from the SNT and the Issue Trust with the Denver Probate Court.

184.    In July 2019, DiPonio, with Dain and Goodwin's knowledge and support, renewed her contempt motion.

185.    Goodwin knew, however, that the SNT and Issue Trust assets are frozen and cannot be deposited with the Denver Probate Court for at least three independent reasons:  (i) the assets have been frozen by JPMorgan Securities in accordance with the FINRA order discussed above; (ii) Chase Bank and JPMorgan Securities, which hold the assets  of these trusts, cannot do so because the trust assets are subject to Illinois citations obtained by the lenders to the Black Family Trusts; and (iii) in response to competing claims to the SNT and Issue Trust assets, Chase and JPMorgan Securities filed the interpleader action discussed above, in Illinois federal court in 2018, and the trust assets can only be released at the conclusion of the interpleader case.

186.    Goodwin therefore knew that there was no basis for finding Bernard in contempt of a Denver Probate Court order concerning assets not under his control.  The purpose of the *ex parte* motion and contempt citation was instead to harass Bernard, cause him to incur additional legal expenses.

187.    Joanne was found in March 2016 not to need a conservator, by a New York court. Under the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act, which both New York and Colorado have enacted, New York is the sole state with jurisdiction to make a determination as to Joanne's need for a conservator.

188.    In light of the decision in New York and Joanne's state of residence, Goodwin has a duty to take steps to terminate the Colorado conservatorship, and distribute its assets to Joanne Black.  Goodwin has failed to do so.

189.    Goodwin has willfully failed and refused to take any actions to terminate the Colorado conservatorship, and instead has used her status as conservator to launch and support litigation in four states. This both breaches her obligation to Joanne as conservator, and provides substantial support and assistance to Dain in his quest for control of what remains of the assets in the Black Family Trusts, and for revenge against Bernard and his family.

190.    As a trustee of the Black Family Trusts, Dain has owed a fiduciary duty to those trusts and to the beneficiaries of those trusts. Dain also has owed a duty of the utmost loyalty, fidelity and good faith to the Black Family Trusts at all times that he has been a trustee of those trusts. Dain's duties as trustee to the Black Family Trusts include duties not to waste or dissipate trust funds for his own personal benefit or for the benefit of others, including Wrigley, who are not beneficiaries of such trusts.

191.    Dain has breached his fiduciary duties to the Black Family Trusts by taking actions to further his own personal interests to the detriment of the Black Family Trusts, including seeking to use, and using, funds from the Black Family Trusts to pursue vengeful and malicious litigation against Bernard and Bernard's family that is not in the best interests of the Black Family Trusts. Dain also has breached his fiduciary duties to the Black Family Trusts by taking actions to further his own personal interests to the detriment of the Black Family Trusts, including using and seeking to use funds from the Black Family Trusts to pursue litigation against Bernard and Bernard's family that is not in the best interests of Joanne or the Black Family Trusts, but rather is designed to gain control over the trusts or to remove assets from the Black Family Trusts so that he and his sister, Wrigley, ultimately will gain control over those assets through their influence over Joanne if the funds in the Black Family Trusts are given to Joanne free of the constraints of the trusts in which those assets now reside.

## COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

192.     Bernard repeats and incorporates the allegations of each of the foregoing paragraphs as if herein stated.

193.     Goodwin, by siding with Dain, and taking guidance and instruction from Dain and counsel hired by Dain who follow Dain's instructions, through both her own actions and joint actions with Dain, in the Denver Probate Court and in litigation around the country, including in Illinois, has knowingly and substantially assisted Dain's breach of his fiduciary duties to the Black Family Trusts.  Goodwin's actions in the Denver Probate Court and in court proceedings around the country have served to enable Dain to waste and dissipate assets of the Black Family Trusts, and to pursue Dain's and Wrigley's personal interests, in breach of Dain's fiduciary duties to those trusts.

194.     Dain's and Goodwin's actions have caused and continue to cause the SNT and the 2013 Trust to spend substantial amounts on legal fees.

195.     Dain's and Goodwin's actions have further caused the trustees of the Black Family Trusts to spend large amounts on legal fees to defend against Dain's and Goodwin's attacks.

196.     As a result of Dain's and Goodwin's actions, the Black Family Trusts are frozen, which has caused the trustees to have to borrow to pay legal fees, to pay interest on these borrowings, and to pay the legal fees of the lenders.

197.     Dain's and Goodwin's actions have caused and continue to cause the lenders to the trusts to spend large amounts on legal fees, which under the loan agreements are an obligation of the Black Family Trusts.

198.     Goodwin's actions have provided substantial assistance to Dain, and made possible his continuing breaches of fiduciary duty to the Black Family Trusts.

199. Goodwin has acted to support and provide substantial assistance to Dain, knowing of the conduct by Dain which constitutes breach of fiduciary duty to the Black Family Trusts.

200. Goodwin has supported Dain's efforts to use assets of the Black Family Trusts to fund his litigation activities around the country against Bernard and Bernard's family, which do not benefit the Black Family Trusts, but which benefit Dain, Wrigley and others instead.

201. Goodwin has supported Dain's efforts to use assets of the Black Family Trusts to fund his litigation activities around the country against Bernard and Bernard's family, which do not benefit Joanne or the Black Family Trusts, but which have been brought in pursuit of Dain's goal to obtain control of the trust assets for the personal gain of himself and his sister, and also for reasons of personal malice and hostility that Dain and Wrigley have for Bernard and Bernard's family.

202. The Black Family Trusts have suffered substantial financial harm, including having had millions of dollars of trust assets wasted, as a direct and proximate result of Dain's breaches of fiduciary duties to those trusts, and as a direct result of Goodwin's efforts to assist Dain, in conduct with breaches his fiduciary duty.

203. Goodwin's actions in aiding and abetting Dain's breaches of fiduciary duty to the Black Family Trusts have been knowing, and indeed intentional, willful and malicious.

WHEREFORE, BBlack Trustee prays that this Court enter judgment in favor of the Black Family Trusts and against Goodwin in the amount of actual damages Bernard proves the Black Family Trusts suffered, individually and collectively, as a result of Goodwin's actions to aid and abet Dain's breaches of fiduciary duties owed to those trusts, plus punitive damages and such other and further relief as this Court deems just and appropriate.

## COUNT II.  CIVIL CONSPIRACY

204.    Bernard repeats and incorporates the allegations of each of the foregoing paragraphs as if herein stated.

205.    Goodwin, acting in concert with Dain, DiPonio, Young, Wrigley, Kerr, Salzman. and other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose, and a lawful purpose by unlawful means.

206.    A principal unlawful purpose was to exploit the Black Family Trusts, for the personal benefit of Goodwin, Dain, Wrigley, Young, DiPonio, and others, by pursing legal claims in four states, without regard to the merits of those claims, whether they had expected benefits to Joanne that exceeded their costs, or whether the conspirators' actions will partly, mostly, or completely exhaust the funds in the 2013 Trust (as already happened) and the SNT (which has already been substantially depleted by legal spending and will be fully depleted if the many lawsuits launched by Goodwin and Dain continue.

207.    The unlawful means include breach of Dain's and Goodwin's separate fiduciary duties through filing frivolous lawsuits in multiple jurisdictions, with the goal not of obtaining an expected recovery in excess of legal spending, but instead the goal of imposing costs on Bernard and the Black family, while benefitting Goodwin and the other conspirators through the fees they have charged for pursuing these lawsuits, and the further Dain and Wrigley goal of revenge against the Black family members for having opposed Dain's and Wrigley's efforts to seize control of the assets in the Black Family Trusts.

208.    A second unlawful means is Goodwin's transfer of savings bonds from the 2013 Trust, sale of those bonds, and spending of the proceeds, both to pay herself and to pay lawyers, in violation of an Illinois citation to discover assets served on Goodwin in connection with a judgment against the 2013 Trust.

209.    A third unlawful means is Goodwin's repeated, flagrant, and knowing violation of her obligation to report to the Denver Probate Court on conservatorship obligations, and instead concealing in these reports the obligations faced by the conservatorship and the SNT.

210.    Dain was the ringleader of the conspiracy.  Dain, together with DiPonio and Young, recruited Goodwin to become Joanne's conservator in 2017, replacing Melissa Schwartz as conservator, join the conspiracy, and pursue senseless litigation in four states that has provided no recovery to Joanne, only expense far exceeding any potential recovery.  Goodwin and the other members of the conspiracy have each received substantial sums for their participation.

211.    Dain, acting as a trustee of the Black Family Trusts, has transferred hundreds of thousands of dollars from the SNT to pay his co-conspirators for their assistance to his conspiracy to extort money from Plaintiff's family. Direct recipients of his transfers include Wrigley, Kerr, DiPonio, Young, and Salzman.  Goodwin has used her position as conservator to incur substantial conservator fees, for which she has paid herself, while concealing from the Denver Probate Court the massive obligations she has incurred for legal expenses.

212.    Goodwin engaged in communications with Dain, DiPonio, Young, and others and acted in close cooperation with them to pursue their common goals.

213.    In furtherance of the conspiracy, Goodwin and the other conspirators committed overt acts and were otherwise willful participants in joint activity.

214.    The conduct by Goodwin, Dain, and the other conspirators was undertaken with malice, willfulness, and reckless disregard for Joanne's interests and for the rights of others to be free from frivolous, malicious litigation.

WHEREFORE, BBlack Trustee prays that this Court enter judgment in favor of the Black Family Trusts and against Goodwin in the amount of actual damages Bernard proves the Black Family Trusts suffered, individually and collectively, as a result of Goodwin's actions to aid and abet Dain's breaches of fiduciary duties owed to those trusts, plus punitive damages and such other and further relief as this Court deems just and appropriate.

## COUNT III – INJUNCTIVE RELIEF

215.    Bernard repeats and incorporates the allegations of each of the foregoing paragraphs as if herein stated.

216.    If injunctive relief is not entered against Goodwin, she will continue to aid and abet Dain's breaches of fiduciary duty owed to the Black Family Trusts in the same manner as she has in the past up to the present time.

217.    If injunctive relief is not entered against Goodwin, the assets in the Black Family Trusts will be entirely exhausted and dissipated such that they will cease to exist and serve the purpose for which they were created.

218.    The Black Family Trusts thereby will suffer an irreparable injury for which there is no adequate remedy at law.  The Black Family trusts also have no adequate remedy at law to address Goodwin's continuing conduct to aid and abet Dain's breaches of fiduciary duty that are designed to fully defund the Black Family Trusts.

WHEREFORE, Plaintiff prays that this Court enter a preliminary and permanent injunction restraining and enjoining Goodwin from initiating and pursuing litigation, as well as continuing to support Dain's efforts in litigation, to remove assets from the Black Family Trusts, defund the Black Family Trusts or otherwise use or dissipate their assets, except for such litigation, if any, as to which Goodwin can demonstrate to the court a reasonable belief that this litigation will benefit Joanne, in an amount that exceeds litigation costs.

BERNARD BLACK, as Trustee of the Joanne Black 2013 Trust Agreement, dated March 22, 2013, the Supplemental Needs Trust for the Benefit of Joanne Black, dated December 19, 1997 and Trustee of the Trust for the Benefit of the Issue of Renata Black

By: /s/Brad S. Grayson
     One of His Attorneys

Benjamin N. Feder (ARDC# 6277452)
Brad S. Grayson (ARDC# 6196336)
Samantha Weissbluth (ARDC# 6244095)
Strauss Malk & Feder LLP
135 Revere Drive
Northbrook, Illinois 60062
(847) 562-1400
bfeder@straussmalk.com
bgrayson@straussmalk.com
sweissbluth@straussmalk.com